**Opinion filed July 16, 2026**



# In The

# Eleventh Court of Appeals

_____

## No. 11-25-00121-CR

_____

**ALEX LEE JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Criminal Court No. 3**
**Tarrant County, Texas**
**Trial Court Cause No. 1840421**

## M E M O R A N D U M   O P I N I O N

The State charged Appellant, Alex Lee Jones, by information with resisting arrest and criminal trespass. *See* TEX. PENAL CODE ANN. § 30.05 (West Supp. 2025), § 38.03 (West 2016).[1]  The jury acquitted him of resisting arrest and convicted him

---

[1]This appeal was transferred to this court from the Second Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West Supp. 2025).

of criminal trespass. The trial court assessed his punishment at confinement for forty-five days in the Tarrant County Jail. In a single issue, Appellant challenges the sufficiency of the evidence supporting his conviction for criminal trespass. We affirm.

*Background Facts*

The events giving rise to the appeal occurred on August 27, 2024, in the lobby of the Tarrant County Corrections Center. Captain Jennifer Renner of the Tarrant County Sheriff's Department testified that she was a jail administrator that was called to the lobby to assist with a man that was seeking information about his brother who was detained in maximum security at the facility. She was accompanied to the lobby by Lieutenant Jose Arroyo. She identified Appellant as the man seeking the information about his brother. Captain Renner advised Appellant that his brother was housed in maximum security pending an investigation for smoking K2.

Captain Renner testified that she attempted to provide the information requested by Appellant but that he became agitated and louder. She opined that Appellant was reluctant to listen to her because he wanted to tell his and his brother's version of what happened. She also testified that Appellant was talking with someone by phone and that he had another phone with which he began recording. Captain Renner returned to the jail administration offices after her initial contact with Appellant. She advised Lieutenant Arroyo that she believed that Appellant was under the influence of something because his eyes were red, bloodshot, and glazed over. She did not feel that he was going to be happy with any answer she might give him.

Appellant offered the recording from his cell phone into evidence. It is approximately two minutes long and it depicts the relevant oral communications between the parties with respect to the offense of criminal trespass. As per this recording, Captain Renner returned to the lobby to advise Appellant that he should

2

go across the street to internal affairs if he wanted to file a formal complaint. Appellant advised her "I'll wait," to which she replied "OK, perfect."

As Captain Renner walked away from Appellant, he began to follow her and give a narration by stating "this here is the Captain," "she is real rude," and "she doesn't want to be on camera." As Captain Renner and Lieutenant Arroyo entered the secure door into jail administration from the lobby, Appellant pointed the camera at Captain Renner and stated that she was "being a little b---h." He called her "b---h" at least four more times (and a "ho" at least three times) with increasing volume as he approached the jail administration door to film Captain Renner and Lieutenant Arroyo through the window of the secure door.

Appellant then directed his comments to Lieutenant Arroyo saying, "F--k you too, p---y boy! I ain't the one in jail, p---y!" At this point, Lieutenant Arroyo opened the jail administration door as Appellant stood against it while filming, and he advised Appellant, "You need to leave." Over the span of a few seconds, Lieutenant Arroyo told Appellant, "You need to leave" at least four more times. Within a matter of seconds, physical contact ensued between Appellant and Lieutenant Arroyo. Appellant told Lieutenant Arroyo "Get your m----r f-----g hands up off me." He repeated, "Get your hands up off me" several more times before the recording from Appellant's cell phone ended.

The State offered into evidence surveillance footage from the lobby. The surveillance footage does not contain audio, and it was recorded from a much greater distance back. It depicts the encounter between Lieutenant Arroyo and Appellant, but its vantage point was so far back that it is difficult to decipher much more than that a scuffle soon ensued after Lieutenant Arroyo exited from the door to jail administration. The scuffle lasted from near the jail administration door to what appears to be an exterior door to the jail lobby.

With respect to the interactions with Appellant, Captain Renner testified that she felt that he was acting in an aggressive manner and that he was extremely agitated. She further testified that they could hear him inside the jail administration offices. Captain Renner testified that she saw Appellant lunge at Lieutenant Arroyo as he exited the door from jail administration.

Lieutenant Arroyo testified that Appellant was blocking the jail administration door while using loud, foul language. Lieutenant Arroyo further testified that he told Appellant multiple times that he needed to leave and that Appellant's body language indicated that he had no intention of leaving. Additionally, Lieutenant Arroyo testified that he had authority to tell someone to leave the jail. Lieutenant Arroyo testified that Appellant lunged at him and that he swatted Appellant's hand away from his face. On cross-examination, Lieutenant Arroyo disagreed with Appellant's trial counsel's suggestion that Appellant was trying to leave.

Appellant testified on his own behalf during the guilt-innocence phase. He stated that he was there at the jail to do a wellness check on his brother and to get the name of an officer. He wanted the officer's name so that he could file an open records request. Appellant did not feel like he was causing a disturbance that day. However, he was frustrated because he felt that the officers were infringing on his rights, and he felt that Captain Renner was making him do her job by asking for information from him. Appellant felt that the officers were "dismiss[ing]" him as he looked at them through the secure door for jail administration.

Appellant testified on direct examination that he never lunged at Lieutenant Arroyo. He further testified that Lieutenant Arroyo grabbed him as soon as he told Appellant to leave, which prevented him from leaving. Appellant testified that Lieutenant Arroyo "bum-rushed [him] all the way into the door."

On cross-examination, Appellant testified, "[Lieutenant Arroyo] just [said] you need to leave. I didn't -- he didn't give me no lawful order really." In that

4

regard, Appellant testified, "I was free to stay. I was free to stay. If I'm free to stay -- you know, I mean, I was -- I wasn't committing no crime, if that makes sense. I was well . . . within my rights." Further, Appellant testified: "I didn't refuse to leave. I never was breaking the law -- committing a crime -- reasonable suspicion to be committing crime to know I got to leave. That was just a statement. So I really didn't know it was a lawful order he was giving me, if that makes sense."

*Analysis*

In his sole issue on appeal, Appellant challenges the sufficiency of the evidence supporting his conviction. Specifically, Appellant asserts that the evidence is insufficient to support his conviction for criminal trespass because he was not given an opportunity to leave the premises.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight witness testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319;

*Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

We measure the sufficiency of the evidence by the elements of the offense as defined in a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

As relevant to this appeal, a person commits the offense of criminal trespass if he entered or remained on or in property of another, including a building, without effective consent and he received notice to depart but failed to do so. PENAL § 30.05(a)(2). "'Notice' means . . . oral or written communication by the owner or someone with apparent authority to act for the owner." *Id.* § 30.05(b)(2)(A). Consistent with Section 30.05(a)(2) and (b)(2)(A), the information alleged that Appellant intentionally or knowingly remained in or on property owned by another without the effective consent of the owner, to wit: "J. Arroyo," and Appellant had notice to depart but failed to do so.

As the Sixth Court of Appeals recognized in *Brown v. State*, "the time from issuance of notice to a full and complete departure cannot be instantaneous; the laws of physics require that it will necessarily take some amount of time for the person to comply with the instruction to leave." No. 06-09-00018-CR, 2009 WL 2340669, at *3 (Tex. App.—Texarkana July 31, 2009, no pet.) (mem. op., not designated for publication). Appellant cites *Brown* for the proposition that a person must be given an opportunity to leave the premises after receiving notice to leave in order to be guilty of criminal trespass. We agree with Appellant's proposition that a person

6

must be given an opportunity to leave when given notice to depart in order to be guilty of criminal trespass. *See id.* However, we conclude that this principle is inapplicable to the facts in this case.

Criminal trespass contemplates a "volitional refusal to leave when requested." *Spingola v. State*, 135 S.W.3d 330, 336 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Reed v. State*, 762 S.W.2d 640, 646 (Tex. App.—Texarkana 1988, pet. ref'd). The offense is complete at the time the refusal to leave occurs. *See Spingola*, 135 S.W.3d at 336; *Reed*, 762 S.W.2d at 646. "The law does not allow a person to remain, after notice has been given, to finish saying or doing what the actor chooses to say or do, and leisurely depart on his or her own terms or when the urge to do so strikes." *Brown*, 2009 WL 2340669, at *3.

Here, Appellant contends that he would have left the jail lobby but for Lieutenant Arroyo preventing him from leaving.[2] Appellant's assertion that Lieutenant Arroyo prevented him from leaving was inherently a credibility determination for the jury to make from the witnesses' testimony and the jury's viewing of the recordings of the incident. Conversely, Lieutenant Arroyo testified that Appellant's body language indicated that he had no intention of leaving. This too was a matter dependent on the jury's assessment of the evidence.

Further, Appellant testified that he did not feel that he needed to leave because he was "free to stay," and he questioned Lieutenant Arroyo's authority to request him to depart. This is evidence that Appellant refused to leave. Contrary to Appellant's claim, the evidence does not establish that he would have left on his own volition, or that he needed more time to leave. *See Stovall v. State*, No. 07-18-00134-CR, 2018 WL 5796971, at *3 (Tex. App.—Amarillo Nov. 5, 2018, no pet.) (mem. op., not designated for publication) ("The evidence, by Ortiz's testimony, is not that

---

[2]The State argues on appeal that Lieutenant Arroyo was trying to move Appellant toward the exit when he made physical contact with Appellant.

appellant began to leave and merely was slow in doing so. The evidence is that appellant refused to leave.").

We must defer to the jury's resolution of the disputed fact issues of whether Appellant's actions constituted a volitional refusal to depart, and whether Lieutenant Arroyo prevented him from leaving. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. We must also defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight witness testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. Viewing the evidence in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence from which a rational jury could have logically found beyond a reasonable doubt that Appellant refused to leave when requested to do so. Accordingly, we overrule Appellant's sole issue on appeal.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


July 16, 2026

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

8